**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DEQUAN SIMPSON,**<br><br>            **Defendant.** | Case: 1:26-mj-00063<br>Assigned To: Judge Upadhyaya, Moxila A.<br>Assign. Date: 3/25/2026<br>Description: COMPLAINT W/ARREST WARRANT |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL**
**COMPLAINT AND ARREST WARRANT**

I, Brian Hills, a Special Agent with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AFFIANT BACKGROUND**

1.      Your affiant is "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. I am a Special Agent with the Federal Bureau of Investigation, Washington Field Office, assigned to the Violent Crimes Task Force since March, 2024. During that time, I have investigated a variety of offenses including carjackings, kidnappings, and armed robberies. Prior to becoming a Special Agent with the FBI, I worked for the Savannah Police Department in Savannah, Georgia from March 2021 to August 2022, where I was a Police Officer assigned to the Patrol Division. As a Police Officer, I responded to and conducted preliminary investigations of a variety of misdemeanor and felony offenses including firearms offenses, motor vehicles thefts, aggravated

assaults, and commercial burglaries. I also previously served as a U.S. Coast Guard Boarding Officer for approximately six years, between May 2014 and May 2021, while I was as an officer on active duty in the U.S. Coast Guard. During that time, I was charged with the enforcement of various federal statutes and regulations and authorized to conduct searches, seizures, and arrests for federal offenses. I have received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches and seizures, the drafting of search warrant affidavits, and probable cause at the FBI Academy in Quantico, Virginia as well as through my prior law enforcement training at the Georgia Public Safety Training Center and the U.S. Coast Guard Maritime Law Enforcement Academy.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement personnel, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all my knowledge, or the knowledge of others, about this matter.

3. I make this affidavit in support of an application for a criminal complaint and arrest warrant for **Dequan SIMPSON**. For the reasons set forth below, I submit that there is probable cause to believe that **SIMPSON** has committed the offenses of Carjacking, in violation of 18 U.S.C. § 2119, and Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), on March 4, 2026. I submit that there is also probable cause to believe that **SIMPSON** has committed the offenses of Carjacking Resulting in Serious Bodily Injury, in violation of 18 U.S.C. § 2119(2), and Using, Carrying, and Discharging a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), on March 6, 2026

4.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.   Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.   *See* 18 U.S.C. § 2711(3)(A)(i).   As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.   *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

5.      The FBI has been investigating two armed carjackings (the latter of which resulted in a shooting) that occurred at 82 Webster Street NE, Washington, DC on March 4, 2026 and March 6, 2026, respectively.   In the first carjacking on March 4, 2026, the victim, a delivery driver for the business Pizza Boli's, was lured to 82 Webster Street NE under the pretext of a routine food order.   When the pizza delivery driver arrived, he was robbed, assaulted, held at gunpoint using a rifle, and carjacked. In the second carjacking on March 6, 2026, the victim, a freelance barber, was lured to 82 Webster Street NE under the pretext of a request for a haircut. When the barber arrived, he was robbed and shot multiple times using a rifle as he was attempting to flee.   In this second incident, the subjects once again carjacked the victim.   Further details regarding both of these carjackings are included below.

March 4, 2026, at 12:38 PM: Carjacking (CCN 26-028-557): 82 Webster Street NE

1.      On March 4, 2026, at approximately 12:38 PM, Metropolitan Police Department ("MPD") and U.S. Park Police ("USPP") officers responded to/near 82 Webster Street NE for a report of a man with a gun.   When officers arrived, they met with three witnesses.

2.      Complaining Witness ("CW") 1 is a pizza delivery driver for Pizza Boli's.   CW 1 had received an order from phone number ██████████ for two shrimp fettucine entrees to be

delivered to 82 Webster Street NE; no apartment number nor customer name was specified.    The order requested that the delivery driver have change for one hundred dollars.

3.    When he arrived, CW 1 parked his silver 2014 Toyota Corolla in the immediate vicinity and met with three suspects at the apartment building at 82 Webster Street NE: Suspect 1 was standing at the front door, Suspect 2 was standing inside the building, and Suspect 3 was standing even further back in the hallway of the building.

4.    Suspect 1 said that he was short $2.    Suspect 2 then brandished a black long-barreled firearm and pointed it at CW 1.    The suspects told CW 1 to come inside and attempted to drag him.    The suspects told CW 1 to give them everything and one said, "You're gonna get shot!"    CW 1 handed over his Samsung cellphone and $60 in cash.    Suspect 1 began to flee, but then came back and ordered CW 1 to give him his car keys.    CW 1 protested that his vehicle was his only source of income, but ultimately handed over the keys to Suspect 1.    CW 1's vehicle was taken; it contained CW 1's wallet and approximately $100 in cash.    CW 1 advised that some "construction guys" were nearby and yelled at the Suspects during the incident.

5.    Officers located CW 1's stolen Samsung cellphone and E-Z Pass near the intersection of Webster Street and Clermont Drive NE.    The cellphone appeared to have been run over, was cracked, and was nonfunctional.

6.    CW 1 noted that he had made a delivery to 82 Webster Street NE on the day before (*i.e.*, March 3) to the first unit on the right-hand side of the first floor of that same building.    CW 1 advised that he had made the delivery to a person who may have been different than Suspect 1 on that day.    Officers knocked on the door to that apartment, but no one answered.

7.    Witness 1 reported that he and Witness 2 were walking in the rear alley of 82 Webster Street NE.    Witness 1 observed Suspects 1 and 2 trying to pull "a pizza man" into the

4

apartment building at 82 Webster Street NE.    Witness 1 ran up to the Suspects and yelled something to the effect of, "Stop it!    Knock it off!"    Suspect 2 then pointed an AR-style rifle at Witness 1.    Witness 1 immediately ran away, with CW 1 not far behind.    They then hid in the basement of a nearby building.    Witness 1 described Suspects 1 and 2 as two younger Black males.

8.    Witness 2 reported that he and Witness 1 were walking up the hill in the adjoining alley between Webster Street and Hawaii Avenue NE, when they heard a noise like a scuffle coming from 82 Webster Street NE.    When he looked over, he observed CW 1 being grabbed by his jacket and pants in the entryway of the apartment building at 82 Webster Street NE.    When Witness 1 approached and started to yell at the Suspects, one of the Suspects brandished a rifle or shotgun and pointed it at Witness 1.    The Suspect then turned toward Witness 2 with the weapon in his hands.    Witness 1 and Witness 2 ran back through the alley in opposite directions.    After he was out of sight, Witness 2 turned around and drew his legally registered handgun but did not shoot.    Witness 2 described Suspect 1 as a Black male wearing dark clothing.    Witness 2 described Suspect 2 as a Black male, tall, thin build, wearing dark clothing and a black ski mask.

March 6, 2026, at 12:37 PM: Carjacking & Shooting (CCN 26-029-518): 82 Webster Street NE

9.    Two days later, on March 6, 2026, at approximately 12:37 PM, MPD responded to/near 82 Webster Street NE for a report of a shooting.    When MPD officers arrived, they met with one witness.

10.    Witness 3 reported that he was in a nearby parking lot, in direct view of 82 Webster Street NE.    Witness 3 observed CW 2 running out of the front door of the apartment building at 82 Webster Street NE.    CW 2 was followed by two Black males, both of whom appeared to be chasing him.    One of the suspects was carrying a gun and pointing it at CW 2.    The suspects

chased CW 2 between the buildings at 82 and 86 Webster Street NE, out of Witness 3's view. Both suspects then reappeared back into Witness 3's view, running back from between the two buildings. The suspects entered a black sedan and fled. CW 2 then walked back from between the two buildings and advised that he had been shot. Witness 3 then called 911. Witness 3 described the suspects as Black males wearing all black clothing. He did not see their faces.

11. A technician from the DC Department of Forensic Sciences responded and recovered seven fired cartridge cases from the front porch and inside of the apartment building at 82 Webster Street NE.

12. An MPD detective responded to a local hospital and met with CW 2, who had sustained gunshot wounds to the right leg. CW 2 explained that he is a freelance barber and often travels to clients' homes to cut their hair. Earlier that day, he had received a text message from Suspect 1 asking for a haircut at 82 Webster Street NE. When he arrived, CW 2 walked through the front door of the apartment building. Suspect 1 brandished a black rifle, pointed it at CW 2, and ordered, "[CW 2's shortened first name], give me all that shit." CW 2 turned around to flee, but was confronted by Suspect 2, who had entered the building behind him. Suspect 2 attempted to block him from leaving, but CW 2 was able to escape out of the front door. As CW 2 was fleeing, one of the suspects started to shoot, ultimately striking him in the right thigh. The suspects caught up to him and demanded his property. CW 2 tossed his car keys and backpack toward the suspects. The suspects picked up his property and ran toward the street, on which CW 2 had parked his black 2009 Infiniti G37X. The suspects then entered CW 2's vehicle and fled. CW 2 then walked to Webster Street NE and asked an unknown citizen to call 911.

13. CW 2 advised that Suspect 1 is the same person who had texted him earlier in the day requesting that he come to the location for a haircut. He stated that he had cut Suspect 1's

6

hair approximately ten times within the past year.   He knows Suspect 1 by the nickname "21."
CW 2 has cut his hair in the first apartment unit on the right inside of 82 Webster Street NE.   CW 2 believed that the apartment may belong to Suspect 1's sister, but believed she had since moved out.   CW 2 advised that he had Suspect 1's phone number saved in his phone, but he could not access it because his cellphone had been struck with a bullet.   Suspect 1 was wearing a mask, but CW 2 recognized his voice.

14.     CW 2 advised that Suspect 2 was not wearing a mask.   CW 2 stated that he had seen Suspect 2 during one of his previous hair-cutting appointments.   He stated that he does not remember exactly where, but recognized Suspect 2 from one of those prior appointments.

March 9, 2026, at 10:18 PM: Arrests (CCN 26-031-249): 11th Street and M Street NW

15.     On March 9, 2026, your affiant located CW 2's vehicle on the unit block of Webster Street NE in the area in front of 90 Webster Street NE.   A USPP officer installed a location tracking device on the vehicle.

16.     Later, on March 9, 2026, at approximately 10:18 PM, MPD voiced over the radio that a vehicle consistent with CW 2's stolen vehicle was traveling eastbound on Florida Avenue NW near New York Avenue NW.

17.     At approximately 10:20 PM, a USPP officer was traveling westbound on Florida Avenue NE when he observed a vehicle traveling at a high rate of speed.   The officer performed a U-Turn and began traveling directly behind the vehicle.   After confirming that the license plate matched CW 2's stolen vehicle, the officer activated his lights and sirens in attempt to conduct a traffic stop near the intersection of Florida Avenue and West Virginia Avenue NE.   Immediately upon activation of the lights and sirens, the suspects began traveling at a higher rate of speed in the opposite lane of travel (*i.e.*, driving the wrong way).   The officer initiated a pursuit.

18.    Throughout the duration of the vehicular pursuit, the suspects exhibited efforts to avoid apprehension, including reaching 70 mph in 25 mph zones, traveling in opposite lanes of travel, disregarding traffic lights, merging across lanes of travel without utilizing turn signals, and driving on pedestrian sidewalks.    The lead officer in the pursuit, who was directly behind the suspects, observed a large black object being discarded from the passenger side of the vehicle near the intersection of K Street and 9th Street NW.    The officer believed that the object was a firearm and/or contraband and voiced his observation such that another officer could respond to confirm his suspicions.

19.    At approximately 10:32 PM, the suspects were traveling southbound on the 11th Street sidewalk when they attempted to turn onto M Street NW.    In doing so, the suspects collided with a USPP cruiser.

20.    Immediately after the collision, video from a closed-circuit television ("CCTV") camera shows a Black male in a black shirt and black pants (later identified as JUVENILE CO-CONSPIRATOR 1, who was 14 years old at the time) exit the rear-passenger door and raise his hands.    A second Black male in a black shirt and black pants (later identified as Dequan Jean SIMPSON) exited the front-passenger door and also raised his hands, with what appeared to be cell phones in each of his hands.    Shortly after JUVENILE CO-CONSPIRATOR 1 and SIMPSON exited the vehicle, a Black male in a black shirt, white undershirt, and black pants exit exited the rear passenger-side door and fled on foot on 11th Street NW.    No one else was in the vehicle.    Officers apprehended SIMPSON and JUVENILE CO-CONSPIRATOR 1 without further incident.

21.    About two minutes later, an officer was flagged down by pedestrians near 1123 11th Street NW; those pedestrians had observed a Black male fleeing from CW 2's vehicle and

into a nearby parking garage.    Officers proceeded to the parking garage and, upon entry, observed a Black male (later identified as ███████████) in a white shirt and black pants positioned upright against the wall around a corner.    Brown exhibited signs of perspiration and being out of breath. The parking garage appeared to be closed via a gate for further entry from 11th Street NW. Additionally, █████'s appearance was consistent with the description of the subject taking flight from CW 2's vehicle.    ███████ was apprehended without further incident.    A black shirt (which was consistent with the one that officers had observed on the fleeing suspect) was discovered lodged into the chain-link fence of the parking garage directly next to where █████ was apprehended.

22.    Officers confirmed that the VIN of the suspects' vehicle was in fact CW 2's vehicle, which (as described above) had been carjacked a few days before on March 6, 2026.

23.    Upon their arrests, officers asked █████, SIMPSON, and JUVENILE CO-CONSPIRATOR 1 for their biographical information.    ███████ provided home address ████ ████████████.    SIMPSON provided home address █████████████████ and phone number ████████.

24.    Upon their arrests, officers also seized three cellphones (collectively, the "SUSPECT DEVICES").

a.    When █████ was apprehended, he did not have any cellphones on his person.

b.    When SIMPSON exited CW 2's vehicle and was apprehended, he had SUSPECT DEVICES 1 and 2 in his hands.    SIMPSON later stated that his cellphone had a photo of him and his "girl" on it.    SUSPECT DEVICE 1 is the only cellphone with a photo of a girl on it.

c.     When JUVENILE CO-CONSPIRATOR 1 exited CW 2's vehicle and was apprehended, he did not have any cellphones on his person.   Subsequently, USPP officers asked JUVENILE CO-CONSPIRATOR 1 if he knew his mother's phone number to call her.   JUVENILE CO-CONSPIRATOR 1 stated that his mother's phone number was in his cellphone.   When officers provided him with SUSPECT DEVICE 2, JUVENILE CO-CONSPIRATOR 1 stated that SUSPECT DEVICE 2 belonged to his "cousin"; officers later learned that JUVENILE CO-CONSPIRATOR 1 and ▮▮▮▮ refer to each other as "cousins."   JUVENILE CO-CONSPIRATOR 1 then stated that his cellphone was in a jacket in CW 2's vehicle.   USPP officers located SUSPECT DEVICE 3 in a pocket of a black jacket found in the front-passenger seat of CW 2's vehicle.   SUSPECT DEVICE 3 was handed to an MPD Detective, who confirmed with JUVENILE CO-CONSPIRATOR 1 that it belonged to him.

25.     Around the time of the arrests, at approximately 10:40 PM, MPD received a call for service in reference to a firearm discovered near the intersection of 9th Street and K Street NW, which is the same area in which the USPP officer had observed the suspects discarding an object from the fleeing vehicle.   Officers responded to the area and met with the witness.   The witness stated that they had observed a black vehicle (consistent with CW 2's vehicle) being pursued by law enforcement, and that vehicle had discarded a large black object.   Officers recovered a Hammerli TAC R1 .22 LR caliber rifle, bearing serial number CIPNHA024499, with a magazine capable of holding twenty rounds.   No ammunition was in the chamber or magazine of the firearm.   A query of the serial number returned no valid registration on file.



26.    The National Integrated Ballistic Information Network ("NIBIN") database generated a lead—that is, an unconfirmed potential match—between this rifle and the digitized images of the fired cartridge casings recovered from the shooting of CW 2 on March 6, 2026.

27.    On March 10, 2026, at approximately 2:36 PM, FBI agents located CW 1's stolen Toyota Corolla in a parking lot at 435 Edgewood Street NE.    This location is less than 0.25 miles from ███████████████, which is the address that █████ provided upon his arrest on March 9, 2026.

<u>IDENTIFICATION OF SIMPSON'S TELEPHONE NUMBER</u>

28.    As described above, on March 4, 2026, CW 1 traveled to 82 Webster Street NE based on the food order placed by the Pinger phone number ███████.[1]    CW 1's restaurant queried their records for other food deliveries to 82 Webster Street NE and were able to locate only two other orders, which occurred on March 2, 2026 and March 3, 2026, respectively (*i.e.*, the day before and two days before the first offense).    Both of those orders were placed by phone number ████████.    It should be noted that the receipts of those orders also display the name "████████."

---

[1] Pinger utilizes Voice over Internet Protocol ("VoIP") and assigns users a phone number that differs from their actual phone number, creating a layer of anonymity.

29.     According to restaurant records and CW 1's statement, CW 1 delivered the food order that had been placed on March 3, 2026.   CW 1 stated that he delivered the order to the first apartment unit on the right side of the first floor at 82 Webster Street NE.

30.     As described above, on March 6, 2026, CW 2 traveled to 82 Webster Street NE based on the request for a haircut.   CW 2 indicated that he had previously provided a haircut to one of the suspects, whose nickname is "21," in the first apartment unit on the right side of 82 Webster Street NE.   CW 2 communicated with the suspect by phone, but CW 2 could not access the phone number because his cellphone was damaged during the shooting.

31.     Based on CW 2's call-detail records, CW 2 was in telephonic contact with ███ ████████ on March 6, 2026 at 11:24 AM and 11:25 AM (*i.e.*, approximately one hour before the offense), the latter of which was seventeen seconds.

32.     As described above, SIMPSON was arrested on March 9, 2026 after he fled in CW 2's vehicle.   When officers were gathering his personal information, SIMPSON provided ████ ████████ as his phone number.

33.     On March 12, 2026, the Honorable Zia M. Faruqui signed Search Warrant 26-SW-86, which authorized the forensic examination of the three cellular devices that law enforcement recovered pursuant to the arrests of SIMPSON, JUVENILE CO-CONSPIRATOR 1, and ████ (*i.e.*, the SUSPECT DEVICES).

34.     On the same day as Search Warrant 26-SW-86, the Honorable Zia M. Faruqui also signed Search Warrant 26-SC-589, which authorized the Government to seize cell site location data associated with SIMPSON's telephone number, █████████, including timing advance data.

35.     Based on a preliminary analysis of the cell site location data associated with ▮ ▮, the associated device was using cellular towers in the vicinity of several important areas relating to the offenses.

a.      As described above, the restaurant for which CW 1 works received food orders from ▮ on March 2, 2026 and March 3, 2026, respectively.    Based on the time stamp of those receipts, the device associated with ▮ was using cellular towers in the vicinity of the delivery address of 82 Webster Street NE on both occasions.

b.      On March 4, 2026, between 11:53 AM and 12:40 PM (*i.e.*, around the time of the first offense), the device associated with ▮ was using cellular towers in the vicinity of the carjacking of CW 1.    Relatedly, GPS location data from JUVENILE CO-CONSPIRATOR 1's cellphone indicates that JUVENILE CO-CONSPIRATOR 1's cellphone was also located near the carjacking of CW 1.

c.      On March 4, 2026, between approximately 12:41 PM and 12:47 PM (*i.e.*, immediately after the first offense), historical cellular location data for the device associated with ▮ is consistent with travel to ▮, which is ▮'s residence.    ▮'s residence is approximately two miles from the offense location.



Tower Activations for ███████ between 11:53 AM and 12:40 PM on 3/4/26

82 Webster Street NE, Washington, DC – Armed Carjacking of Pizza Boli's Driver at Approximately 12:37 p.m. on March 4, 2026

T-Mobile Tower



d.          Surveillance video from [REDACTED]'s residence around that time shows two individuals.   The individual who is wearing a black jacket and no shirt appears to be SIMPSON.    The other individual appears to be JUVENILE CO-CONSPIRATOR 1. GPS location data associated with JUVENILE CO-CONSPIRATOR 1's cellphone shows that after the carjacking of CW 1 and around the time of this surveillance video, JUVENILE CO-CONSPIRATOR 1's cellphone is still located near the offense location (82 Webster Street NE). However, the surveillance video from the hallway of [REDACTED]'s residence shows

the individuals who appear to be JUVENILE CO-CONSPIRATOR 1 and Simpson in the hallway for over an hour.   During that time, JUVENILE CO-CONSPIRATOR 1 is not seen with his own cellphone; at one point, JUVENILE CO-CONSPIRATOR 1 began to use SIMPSON's cellphone, which is consistent with JUVENILE CO-CONSPIRATOR 1 leaving his cellphone at 82 Webster Street NE following the carjacking of CW 1.

 

e.        On March 6, 2026, at 12:34 PM (*i.e.*, around the time of the second offense), the device associated with ▮▮▮▮▮▮ was using a cellular tower in the vicinity of the shooting and carjacking of CW 2.   GPS location data from JUVENILE CO-CONSPIRATOR 1's cellphone shows that JUVENILE CO-CONSPIRATOR 1's cellphone was also located near the carjacking and shooting of CW 2 and consistent with the travel of the device associated with ▮▮▮▮▮▮ immediately following the carjacking and shooting.

f.        On March 6, 2026, between 12:35 PM and 1:07 PM (*i.e.*, immediately after the second offense), historical cellular location data for the device associated with ▮▮▮ ▮▮▮ is consistent with travel to the vicinity of ▮▮▮▮▮▮▮▮▮

16

██████████████, which is SIMPSON's residence.    SIMPSON's residence is

approximately seven miles from the offense location.





g.    Surveillance video from the ▮▮▮▮▮▮▮ Apartments showed a vehicle that appears consistent with CW 2's carjacked vehicle arriving at approximately 2:09 PM, according to the video timestamp.[2]    Two individuals exited the vehicle and entered ▮▮▮ ▮▮▮▮▮.    One of the individuals carried a bag or backpack.    One of the individuals wore a gray coat with what appears to be a fur-trimmed hood, and the other individual wore a black coat with what appears to be a fur-trimmed hood.    These coats are consistent in appearance with the coats worn by the two individuals, who appeared to

---

[2]  The time stamp displayed on the video at the time that it was retrieved appeared to be accurate. However, Daylight Savings Time took effect on March 9, 2026, which was after the date of the offense but before the video was retrieved.   Based on video from MPD's CCTV cameras, the actual time of this video was probably approximately 1:09 PM, rather than 2:09 PM.

be SIMPSON and JUVENILE CO-CONSPIRATOR 1, when they arrived at ███

███████████████, following the carjacking of CW 1 on March 4, 2026, as described

above.

h.          On March 9, 2026, at 7:15 PM (*i.e.*, approximately three hours before USPP's

pursuit of CW 2's carjacked vehicle and subsequent arrests of SIMPSON, ██████, and

JUVENILE CO-CONSPIRATOR 1), the device associated with ██████████ was using

a cellular tower in the vicinity of ████████████████████████████████.   Based

on surveillance video from that location at that approximate time, SIMPSON, ██████, and

JUVENILE CO-CONSPIRATOR 1 appeared to be in that apartment building, as shown

below.







i.      On March 9, 2026, between 10:22 PM and 10:33 PM, historical cellular location data for the device associated with ▮▮▮▮▮ is consistent with the travel path of USPP's pursuit of CW 2's carjacked vehicle, which (as described above) led to the arrests of SIMPSON, ▮▮▮, and JUVENILE CO-CONSPIRATOR 1.



j.        On March 9, 2026, at 10:32 PM (*i.e.*, around the time that USPP arrested SIMPSON and JUVENILE CO-CONSPIRATOR 1), the device associated with ▮▮▮▮ ▮▮▮▮ was using a cellular tower in the vicinity of USPP's arrests of SIMPSON and JUVENILE CO-CONSPIRATOR 1.



k.        There is no cell site location data for ▮▮▮▮▮ after March 9, 2026, at 10:59 PM, which is approximately the same time that a USPP Detective placed SUSPECT DEVICES 1 through 3 in airplane mode and turned off Bluetooth.   This information further suggests that the device believed to be SIMPSON's is associated with the number that he provided to law enforcement (*i.e.*, ▮▮▮▮▮ ).

PRIOR COMMUNICATIONS REGARDING THE OFFENSES AND SIMPSON'S

CONNECTION TO THE NICKNAME "21"

36.     As described above, Search Warrant 26-SW-86 authorized the forensic examination of SUSPECT DEVICES 1, 2, and 3, which are associated with SIMPSON, ███, and JUVENILE CO-CONSPIRATOR 1.   As of yet, an extraction of the data from SUSPECT DEVICE 1 (*i.e.*, SIMPSON's device) has been unsuccessful.   Your affiant is still reviewing the data associated with SUSPECT DEVICES 2 and 3, but a preliminary review revealed the following.

37.     On February 26, 2026, phone number ████████ (*i.e.*, SIMPSON's known phone number) texted ████'s cellphone (*i.e.*, SUSPECT DEVICE 2) and said, "[T]his my new number," followed by, "This 21."   The subscriber records associated with ████████ show a start date of February 26, 2026.   As previously discussed, CW 2 identified the nickname "21" as the suspect who had lured him to 82 Webster Street NE on March 6, 2026.

38.     ████'s cellphone also contained a screenshot with a listed date of February 27, 2026 of a FaceTime call with ████████.   The individual in the screenshot appears to be SIMPSON.



39.    In addition to identifying himself by the nickname "21" in text communications with JUVENILE CO-CONSPIRATOR 1 and ███████, SIMPSON is also connected to the nickname "21" through his usernames for his social media accounts.    For example, the profile photo for the TikTok account "21frmdahope," which was identified in communications in both ███████'s and JUVENILE CO-CONSPIRATOR 1's cellphones, appears to be the same as the photo on the home screen of SIMPSON's cellphone (*i.e.*, SUSPECT DEVICE 1), which is one of the cellphones that SIMPSON had in his hand at the time of his arrest.    Below is a comparison of the home screen of SUSPECT DEVICE 1, the TikTok account "21frmdahope," and the profile photo associated with that account.



40.     Furthermore, on its profile page, the TikTok account "21frmdahope" also explicitly links to Instagram account "2shiesty.21," as displayed above.   Publicly viewable information on the Instagram account "2shiesty.21" contains multiple videos of an individual who appears to be SIMPSON, as shown below.



41.     Based on communications from JUVENILE CO-CONSPIRATOR 1's and ████'s cellphones, there is evidence indicating that SIMPSON's phone number prior to February 26, 2026

was ▮▮▮▮▮. Specifically, JUVENILE CO-CONSPIRATOR 1's cellphone contains both ▮▮▮▮▮▮▮▮▮▮ saved in his contacts as "21," which is SIMPSON's nickname. Based on the available data, text communications from ▮▮▮▮ to JUVENILE CO-CONSPIRATOR 1 and ▮▮▮ ceased on February 25, 2026, a day prior to the start-of-service date for ▮▮▮▮. Based on the available data, ▮▮▮▮ messages "▮▮▮▮," which is SIMPSON's residence, to JUVENILE CO-CONSPIRATOR 1 on at least three occasions and sends multiple photos of SIMPSON with JUVENILE CO-CONSPIRATOR 1.

42. As described above, the suspects lured CW 2, a freelance barber, to 82 Webster Street NE. CW 2 identified the nickname "21" as the suspect who had lured him under the pretext of requesting a haircut. On February 24, 2026 (*i.e.*, about ten days before the carjacking and shooting of CW 2), ▮▮▮▮ and JUVENILE CO-CONSPIRATOR 1 had the following conversation about their plan to "rob the barber."

| Date/Time | From | To | Message |
|---|---|---|---|
| 2/24/26 at 11:02 a.m. | ▮▮▮▮ (Believed to be Simpson) | Juvenile Co-Conspirator 1 | Yo Marzo ? |
| 2/24/26 at 11:03 a.m. | Juvenile Co-Conspirator 1 | ▮▮▮▮ | Yoo |
| 2/24/26 at 11:03 a.m. | ▮▮▮▮ | Juvenile Co-Conspirator 1 | U wanna rob the barber N****. Munchie dat be cutting my hair ? |
| 2/24/26 at 11:03 a.m. | ▮▮▮▮ | Juvenile Co-Conspirator 1 | He got dog shit. On Apple Pay |
| 2/24/26 at 11:03 a.m. | Juvenile Co-Conspirator 1 | ▮▮▮▮ | It's up too u |
| 2/24/26 at 11:03 a.m. | ▮▮▮▮ | Juvenile Co-Conspirator 1 | I know he do dats the only. Thing he used too on 3 |
| 2/24/26 at 11:04 a.m. | ▮▮▮▮ | Juvenile Co-Conspirator 1 | Say no more we Doing it we gon call him this week get some free cuts after that ima whip out p b like man go to ur phone send all dat shit now or ima. Hit u right here |
| 2/24/26 at 11:04 a.m. | ▮▮▮▮ | Juvenile Co-Conspirator 1 | We gon bring him to shawty house |
| 2/24/26 at 11:04 a.m. | Juvenile Co-Conspirator 1 | ▮▮▮▮ | Bet |
| 2/24/26 at 11:04 a.m. | ▮▮▮▮ | Juvenile Co-Conspirator 1 | And when we getting ur cousin we need to do dat ASAPP DATS SOMEE LIL QUICK CASH TOO YEME AND FREE CAR |

43.    In the above conversation, ███████ stated that he was going to call their targeted victim "this week" to initiate their plan to lure him to "shawty house" and rob him.    Call-detail records for ███████ show a four-second outgoing call to CW 2 on February 27, 2026, consistent with the plan to call the barber the week of February 24, 2026 to initiate their plan to rob him.    A day before the above conversation, on February 23, 2026, phone number ███████ had sent to JUVENILE CO-CONSPIRATOR 1 a series of photographs (included below) of JUVENILE CO-CONSPIRATOR 1 and SIMPSON with a firearm that appears to be consistent with the rifle that law enforcement seized on March 9, 2026 during the pursuit and arrest of SIMPSON, JUVENILE CO-CONSPIRATOR 1, and ███████ and that is potentially connected (via the NIBIN lead, as described above) to the shooting and carjacking of CW 2.



SIMPSON'S ASSOCIATION WITH 82 WEBSTER STREET NE, APARTMENT #1

44.    As described above, the restaurant for which CW 1 works received food orders from ███████ on March 2, 2026 and March 3, 2026, respectively.    Based on those receipts,

26

the delivery address for those orders was 82 Webster Street NE on both occasions.    On the latter occasion, CW 1 reported that he had delivered the food order to the first door on the right on the first floor, which would be Apartment #1.

45.    As described above, on March 6, 2026, CW 2 traveled to 82 Webster Street NE based on the request for a haircut.    CW 2 indicated that he had previously provided a haircut to one of the suspects, whose nickname is "21," in the first apartment unit on the right side of 82 Webster Street NE, which would be Apartment #1.

46.    Records for the phone number that SIMPSON gave to law enforcement (*i.e.*, ▬▬▬▬ ) listed the subscriber as ▬▬▬▬ with a listed address of ▬▬▬▬ ▬. ▬▬▬▬ was present when MPD previously responded to incidents at 82 Webster Street NE, Apartment #1, on January 1, 2025; March 28, 2025; July 23, 2025; and August 3, 2025.

47.    According to leasing records, the listed resident for 82 Webster Street NE, Apartment #1, is ▬▬▬▬ .    An MPD report from August 5, 2024 listed ▬▬▬▬ niece as "▬▬▬" with a phone number that is associated with ▬▬▬▬ in other MPD records.

48.    From February 26, 2026 through March 9, 2026, historical cell site records show that the device associated with ▬▬▬▬ frequently used cellular towers in the area of 82 Webster Street NE.    Of particular note, on six days during that period, including March 4, 2026 and March 6, 2026, cellular tower connections between 1:00 AM and 7:00 AM were all consistent with the device being in the area of 82 Webster Street NE.

49.    On February 25, 2026, and February 28, 2026, phone number ▬▬▬▬ sent messages to ▬▬▬'s cellphone that read, "82 Webster st ne."    Around the times that these

messages were sent, the device associated with ███████ was again using a cellular tower near 82 Webster Street NE.

50.    On March 9, 2026, at 12:26 PM, phone number ████████ sent another message to JUVENILE CO-CONSPIRATOR 1's cellphone that read, "I took a shower at ████ joint." Around that time, the device associated with ████████ was again using a cellular tower near 82 Webster Street NE.

51.    Based on a review of the call-detail records, on March 8, 2026 (*i.e.*, two days after the shooting and carjacking of CW 2), phone number ████████ called CW 2 using the prefix *67, which blocks the caller's phone number from being detected by the recipient.    Based on the records, the call connected for approximately sixty-one seconds.

52.    It should be noted that on March 24, 2026, CW 2 stated that he does not know someone with the nickname "21" and that he was "high" when he told the MPD Detective that information.    CW 2 also stated that he had previously been to the apartment building at 82 Webster Street NE at least one other time, not ten other times.    CW 2 also denied that he received a call from "21" after the shooting on March 8, 2026.    CW 2 also repeatedly emphasized that he did not want to participate in this investigation, before essentially terminating the conversation.

### CONCLUSION

Based upon the foregoing, I respectfully submit that there is probable cause that **Dequan SIMPSON** committed the offenses of Carjacking, in violation of 18 U.S.C. § 2119, and Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), on March 4, 2026.    I also respectfully submit that there is probable cause the **Dequan SIMPSON** committed the offenses of Carjacking Resulting in Serious Bodily Injury, in violation of 18 U.S.C. § 2119(2), and Using, Carrying, and Discharging a Firearm

During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), on

March 6, 2026.

Respectfully submitted,

_____
Brian Hills
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Federal Rule of Criminal Procedure 4.1 and 41(d)(3) by telephone on March 25, 2026.

_____
Honorable Moxila A. Upadhyaya
United States Magistrate Judge